Francesco G. **CAMPITI** et al., Plaintiffs-Appellees,

v.

Michael A. **WALONIS** et al., Defendants-Appellants.

No. 79–1213.

United States Court of Appeals, First Circuit.

Argued Sept. 13, 1979.

Decided Dec. 18, 1979.

Lee Carl Bromberg, Sp. Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for defendants-appellants.

Max D. Stern, Boston, Mass., with whom Stern & Shapiro, Boston, Mass., was on brief, for plaintiffs-appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

This is an appeal by defendants-appellants from a judgment of the district court holding them liable to plaintiffs-appellees in a 42 U.S.C. § 1983 civil rights action for intercepting and disclosing a telephone conversation in violation of Title III of The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. Defendants were also found liable in a pendent jurisdiction action brought pursuant to the Massachusetts statute covering the interception of wire communications, Mass. Gen.Laws ch. 272, § 99, which has a civil remedy provision, part Q, similar to the federal law.

Plaintiff Francesco Campiti was an inmate at Massachusetts Correctional Institute, Walpole (Walpole), at the time the telephone conversation was intercepted. Plaintiff Joseph Pioggia was at the Franklin County House of Correction. The defendants are Frank Hall, Massachusetts Commissioner of Corrections; Michael Walonis, an investigator for the Security Management Team (S.M.T.) of the Massachusetts Department of Corrections; Frank Gunther, Superintendent of Walpole; and Dennis Brown, Deputy Superintendent of Walpole.

The issues involve the applicability of the federal and state statutes and the defenses available under them.

*The Facts*

The district court's thoughtful and comprehensive opinion, *Campiti v. Walonis*, 453 F.Supp. 819 (D.Mass.1978), contains a detailed exposition of the facts from which we borrow heavily.

On September 13, 1975, both plaintiffs were inmates of the Franklin County House of Correction. Starting that day, the Springfield Union, a newspaper circulated in the area, printed the first of a series of articles asserting that plaintiffs, along with certain other inmates, had been improperly receiving favored treatment, such as work release privileges and furloughs, from Sheriff Martin, the person in charge of the House of Correction. Because of the articles, defendant Hall transferred Campiti to Walpole where he was placed in a maximum security unit. Pioggia was not transferred to Walpole. Hall also ordered an S.M.T. investigation of conditions at the Franklin County House of Correction.[1] After arriving at Walpole, Campiti requested permission to telephone Sheriff Martin.

On September 19, 1975, Walonis came to Walpole in connection with another S.M.T. investigation. He met with defendants Gunther and Brown in Gunther's office. During the meeting, Gunther brought up Campiti's request to call Sheriff Martin. It

1. An investigation by the District Attorney of Franklin County resulted in indictments against plaintiffs on February 6, 1976. After Campiti was acquitted on November 16, 1976, the case against Pioggia was dismissed.

was agreed that permission to make the call should be given and that Walonis would monitor it. Walonis then went to the Outer Control Section of the prison where he would be able to listen to the conversation by using an extension telephone wired directly into the main switchboard. This extension phone was part of an override extension system at Walpole which can intercept any call. This system provides emergency contact with any part of the prison. It is also used to monitor inmate calls, which is done on an average of about two calls a week, or when there is reason to expect illegal inmate activity. The extension system is also used to monitor staff calls to ensure that they are not made for personal use.

Campiti was notified that he could call Sheriff Martin and was taken to Brown's office to do so. The call was put through via New England Tel. and Tel. lines by a prison officer, James Lambirth, who turned the phone over to Campiti after Martin was identified as being on the other end. After Campiti took the phone, Lambirth went into another office where he could hear the sound of Campiti's voice, but could not make out what he was saying. It was usual procedure for an officer to position himself so as to be able to hear and comprehend telephone calls made by a maximum security inmate. This was not done in this case because the officer knew the call was being monitored.

Walonis monitored the call, which took about five minutes, and made handwritten notes of the conversation. In addition to talking to Sheriff Martin, Campiti also talked to Pioggia. Walonis prepared a one page report on the call which was made part of the S.M.T. final investigation report. The contents of the call were disclosed to various individuals, including, but not limited to, defendants Hall, Gunther, and Brown. Hall specifically authorized disclosure of the substance of the call to the Attorney General of Massachusetts, the Franklin County District Attorney, and a state police officer named George Powers.

The district court made specific findings which are not challenged on appeal. None of the participants in the call consented to or was aware that it was being monitored. Although appellants do not contest this finding, they do claim that consent and knowledge should be implied from the circumstances in which the call was made. The monitoring was uncovered during discovery procedures in another case, see footnote 1, *supra*. There were no regulations at Walpole informing inmates that telephone calls might be monitored. The usual method of monitoring inmate calls was by a prison officer remaining close enough to hear what the inmate said.

The district court also found that Walonis knew of the federal wiretap statute at the time he monitored the call, but thought that it only applied to a foreign device attached to a telephone line. He was unaware of the Massachusetts wiretap statute. The court noted, without making a finding, that Walonis testified that he believed then, and still believes, that monitoring an inmate call on institution equipment in a maximum security prison was perfectly legal. Defendants Gunther and Brown also held the same belief. The court found that Walonis, as a member of S.M.T., had never previously monitored a telephone call, although he had done so when he was a switchboard operator at Massachusetts Correctional Institute, Norfolk.

Appellants object to the finding of the district court that this monitoring was not reasonably related to maintaining internal security at Walpole. Our examination of the record convinces us that this finding was not clearly erroneous; in fact, it seems clearly correct.

I. *The Federal Statute*

The liability sections of the statute are 18 U.S.C. §§ 2511(1)(a) and 2520. Section 2511(1)(a) subjects to criminal sanctions: any person who—

(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication[.]

Civil actions are authorized under section 2520:

Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person—

(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(b) punitive damages; and

(c) a reasonable attorney's fee and other litigation costs reasonably incurred.

## A. *The Claimed Exclusions*

Appellants claim that, because of the equipment used and the circumstances under which the intercept was made, they come within specific exclusionary provisions of the statute. The first such provision relied on is in the definitions part of the statute, 18 U.S.C. § 2510(5)(a)(i) and (ii):

(5) "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire or oral communication other than—

(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or used by a communications common carrier in the ordinary course of its business and being used by the subscriber or used in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties[.]

Appellants argue that, since Walonis was using an extension phone furnished by the telephone company in the ordinary course of its business and that his use was in the ordinary course of business at Walpole and/or was being used by him as a law enforcement officer in the ordinary course of his duties, there was no violation of the Act. This argument assumes as a predicate the key question: whether Walonis' use was "in the ordinary course of business at Walpole and/or whether Walonis' use was in the ordinary course of his duties" as a law enforcement officer.

Before we get to this issue, we first deal with appellants' assertion that an "extension phone" exemption has been carved out of the Act, excluding the use of extension phones from its prohibition. Appellants rely primarily on four cases, none of which we find controlling. In *Anonymous v. Anonymous,* 558 F.2d 677 (2d Cir. 1977), the Second Circuit held that the Act did not encompass the taping of a wife's telephone calls for use in a custody fight.[2] The court reasoned that, since what was involved was purely a domestic conflict, it did not rise to the level of a violation of the statute. *Id.* at 679. While the court in passing did state that a husband's listening in on the telephone calls of his wife and daughter would be in the ordinary course of the user's business, *id.* at 678, there is no suggestion in the opinion that the use of an extension phone to monitor a call automatically triggers the exemption. *Simpson v. Simpson,* 490 F.2d 803 (5th Cir.), *cert. denied,* 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974), held, despite the finding "[t]he naked language of Title III, by virtue of its inclusiveness, reaches this case," *id.* at 805, that the secret recording of a wife's conversation by a husband for use in divorce proceedings was not covered by the Act.[3] We make no comment

---

**2.** The court's reasoning was greatly influenced by Professor Herman Schwartz's testimony before the House Judiciary Committee which resulted in the addition of the phrase "in the 'ordinary course of [the user's] business.'" Schwartz testified: "Now, we can see in certain circumstances where [the exemption]

makes some sense. I take it nobody wants to make it a crime for a father to listen in on his teenage daughter or some such related problem." *Anonymous v. Anonymous,* 558 F.2d 677, 679 (2d Cir. 1977).

**3.** *Simpson* has been severely criticized. In *United States v. Jones,* 542 F.2d 661, 669 (6th

on the holding of *Simpson*, but point out that it did not involve the use of an extension phone and the decision was expressly "limited to the specific facts of [the] case." *Id.* at 810. *United States v. Christman*, 375 F.Supp. 1354 (N.D.Calif.1974), involved the use of an extension phone system in a department store to monitor and record telephone calls of employees. In the course of its decision finding that the Act did not apply, the court stated: "An extension telephone is not an intercepting device within the meaning of the statute." *Id.* at 1355. We have serious reservations as to the correctness of the court's interpretation of the statute and flatly reject its conclusion as to the use of an extension phone. *Smith v. Wunker*, 356 F.Supp. 44 (S.D.Ohio, W.D. 1972), also relied on by appellants, is not apposite. It held that the recording of a private conversation by a party to it does not violate the statute. ·

■ We have been unable to divine any reason for an "extension telephone" exception. The purpose of the statute is to prohibit the secret monitoring of wire communications. Its application should not turn on the type of equipment that is used, but whether the privacy of telephone conversations has been invaded in a manner offensive to the words and intent of the Act.

This brings us to the nub of the issue, whether this intercept falls within the meaning of the phrases "in the ordinary course of its business" or "in the ordinary course of duties" of a law enforcement officer.

Cir. 1976), the court stated: "Our review of the legislative history of this section, testimony at congressional hearings, and debates on the floor of Congress, inescapably lead to the conclusion that 18 U.S.C. § 2511(a) establishes a broad prohibition on all private electronic surveillance and that a principal area of congressional concern was electronic surveillance for the purposes of marital litigation." *See also Kratz and Roehrs v. Kratz and Cadmus*, 477 F.Supp. 463 (E.D.Pa.1979); *Remington v. Remington*, 393 F.Supp. 898, 901 (E.D.Pa.1975).

4. We therefore need not decide whether, had this call been intercepted pursuant to an established prison policy of which the prisoners had

■ Appellants have devoted a good portion of their brief to urging that this was routine monitoring and that Walonis' eavesdropping was pursuant to his official duties. The claim of routine monitoring flies in the face of the facts. The usual method of monitoring was for a guard to stand near enough to the caller to hear that end of the conversation. Walonis, moreover, had never engaged in telephone monitoring before as a member of S.M.T. The decision to have Walonis listen in on Campiti's call to Sheriff Martin was thus an exceptional course of conduct for both Walonis and the Walpole administration.[4] The facts lead to but one conclusion: the only reason Campiti was allowed to make the call was so that it could be monitored. Appellants find a "striking analogy" to this case in *Briggs v. American Air Filter Co.*, 455 F.Supp. 179 (N.D.Ga.1978), which held that the use of an extension phone by an employer to determine if an employee was disclosing confidential business information to a competitor was a use "in the ordinary course of business". This reading flouts the words of the statute and establishes an exemption that is without basis in the legislative history of the Act.[5]

■ We hold that 18 U.S.C. § 2510(5)(a)(i) and (ii) does not provide the basis for a "prison exemption" from the Act.

Appellants next invoke section 2511(2)(a)(i) in an attempt to insulate the monitoring from the impact of the statute. This section provides:

been informed, the monitoring could permissibly qualify as part of the ordinary course of correctional officers' business within the purview of 18 U.S.C. § 2510(5)(a).

5. The Senate Report declares that Title III created a flat ban on all unauthorized electronic surveillance: "Title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials engaged in the investigation of specified types of major crimes after obtaining a court order . . .." S.Rep.No.1097, *reprinted in* 2 U.S. Code Cong. & Admin.News, 1968, 90th Cong., 2d Sess., at p. 2113.

It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the carrier of such communication: Provided, That said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

 It is hard for us to understand how this section applies to the use of an extension phone by someone other than an employee or agent of the telephone company. The section is obviously intended to allow the telephone company to intercept and disclose calls as a necessary protection of its equipment and rights: *United States v. Beckley,* 259 F.Supp. 567 (D.Ga.1965) (telephone company may monitor calls to identify corrupt employee abusing long-distance system), *cited in* S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News 2182. *See United States v. Harvey,* 540 F.2d 1345, 1350–51 (8th Cir. 1976); *United States v. Freeman,* 524 F.2d 337, 340–41 (7th Cir. 1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976); *United States v. Clegg,* 509 F.2d 605, 613 (5th Cir. 1975). Walonis was not an agent of the telephone company and the monitoring had nothing to do with telephone company equipment or rights. The case cited by appellants in support of their claim to the protection of this exception only reinforces our reading of this section of the statute. In *United States v. Savage,* 564 F.2d 728 (5th Cir. 1977), the Fifth Circuit held that this section applied to a situation in which a motel switchboard operator reported to the police a telephone conversation concerning criminal conduct which she

had overheard. The call came in to the motel switchboard and, as operator, she put it through to the room of the party called. The court specifically found that the intercept was inadvertent. *Id.* at 730. This is just the opposite of the deliberate premeditated intercept in the instant case. Of even more significance is the fact that the court accepted as a matter of course and without discussion the district court's ruling that there *was* a violation of the Act when the switchboard operator turned her headset over to the policeman so that he could listen in on the telephone conversation. *Id.* at 731.

We hold that 18 U.S.C. § 2511(2)(a)(i) does not apply.

Appellants' final attempt to invoke an exemption provision of the statute focuses on section 2511(2)(c):

It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

 It is argued that, under the circumstances prevailing, Campiti gave his implied consent to the monitoring. The circumstances from which the implied consent allegedly flowed are: that he was in restricted custody, that the call was placed for him by a staff officer,[6] that the common practice at Walpole was to monitor such calls, that the expectation of inmates was that calls would be monitored and that he kept the call short and the conversation innocuous. This boils down to the proposition that Campiti should have known his call would probably be monitored and he, therefore, gave consent. The only case advanced for this novel theory is one interpreting a similar but not identical provision of the wiretapping statute of Pennsylvania, *Commonwealth v. Gullett,* 459 Pa. 431, 329 A.2d 513, 518–19 (1974). In *Gullett* an anonymous phone call

---

**6.** Appellants' claim, brief at 33, that the corrections officer remained in Campiti's presence during the call is at variance with the district court's explicit finding that he stepped into an outer office during the time Campiti was on the phone.

was made to the police after a woman had been sexually assaulted and strangled. The caller informed the police as to the facts of the homicide, the location of the body, and hinted that this was the first in a series of killings. The call was later traced to the defendant. The Supreme Court of Pennsylvania, not unreasonably, found that permission to divulge the contents of the call was clearly implied. To accept appellants' theory of implied consent here would completely distort the plain words of section 2511(2)(c), legalizing an intercept where "one of the parties . . . has given prior consent to such interception." The district court did not err in finding that there was no consent for the monitoring. We hold that there was no implied consent.

### B. *The Good Faith Defense*

The civil liability section of the Act, 18 U.S.C. § 2520, provides: "A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter or under any other law."

■ Appellants' argument, as we understand it, runs as follows. Since they relied on the statutory exemptions and acted in a good faith belief that the Act did not apply, they have a complete defense to this action. Appellants seek to avoid the specific requirements of "a court order or legislative authorization" by grafting onto this section of the statute the good faith immunity defense afforded police officers in 42 U.S.C. § 1983 civil rights actions. The cutting point for this graft is found in the following words from S.Rep.No.1097, 90th Cong., 2d Sess. (1968), *reprinted in* [1968] U.S.Code Cong. & Ad.News 2196: "A good faith reliance on a court order would constitute a complete defense to an action for damages. (*Compare Pierson v. Ray*, 87 S.Ct. 1213, 386 U.S. 547 [18 L.Ed.2d 288] (1967))." Appellants claim that this language evinces congressional intent to adopt the common law good faith immunity defense established in

*Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967): "We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983."

We note first that this part of section 2520 was amended in 1970 by inserting the words "legislative authorization" in place of "provisions of section 2518(7)." Pub.L.No. 91–358, title II, § 211(c), 84 Stat. 654. Part (7) of section 2518 authorizes emergency intercepts "with respect to conspiratorial activities threatening the national security interest or to conspiratorial activities characteristic of organized crime." Whatever the reason for the change,[7] it is clear that specifically requiring "legislative authorization" is more restrictive and precise than the language it supplanted.

■ Since there was no "court order" or "legislative authorization," a literal reading of the statute eliminates any good faith defense. Nor do we think defendants are aided by the cryptic reference to *Pierson v. Ray* in the Senate Report. In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, there was legislative authorization. Section 2087 of the Mississippi Code was relied on by the police officers at the time of the arrest that gave rise to that case. Prior to the decision in *Pierson v. Ray*, but after the arrest, the Supreme Court in *Thomas v. Mississippi*, 380 U.S. 524, 85 S.Ct. 1327, 14 L.Ed.2d 265 (1965), held that section of the Mississippi Code unconstitutional. In *Pierson v. Ray*, the Supreme Court held that "a police officer is not charged with predicting the future course of constitutional law." *Id.* 386 U.S. at 557, 87 S.Ct. at 1219. Neither the reasoning nor the holding of *Pierson v. Ray* applies to this case. There was no state statute here authorizing the intercept; quite to the contrary, the Massachusetts wiretap statute, Mass.Gen.Laws ch. 272, § 99, specifically

---

7. The legislative history suggests that the purpose of the change was to protect common carriers from liability for following the orders

of law enforcement officials. 115 Cong.Rec. 37192–93 (1969) (remarks of Senator McLellan).

forbids such conduct. No "future course of constitutional law" was involved at all. What we have here is action taken not in reliance on legislative authorization, but on a completely erroneous belief that the statute did not apply to an extension phone or to prison officials. Appellants' good faith defense argument would mean that a defendant's interpretation of the statute, no matter how distorted, would be a complete defense to liability. The next logical step would be immunity based on the belief that the law was wrong and should not be obeyed.

We hold that appellants are not entitled to invoke the statutory good faith defense.

## II. *The Massachusetts Statute*

Appellants' argument as to the nonapplicability of the Massachusetts statute is a rerun of their claims for exemption under the federal statute. This is because the Massachusetts statute, with some minor variations, tracks the Federal Act. In *Commonwealth v. Vitello*, 367 Mass. 224, 327 N.E.2d 819 (1975), the Supreme Judicial Court made a comprehensive and detailed review of the Massachusetts law. It noted:

> Before we turn to the specifics of the provisions challenged by the defendants, we note that the Massachusetts statute in major portion matches section for section the provisions of Title III. Admittedly, the phraseology of our State statute is not word for word that of the Federal act. However, in substance the requirements of the Massachusetts statute are the same as those of Title III, as the legislative history of Title III shows that they should be.

*Id.* 327 N.E.2d at 836. The Massachusetts court was aware of the role of a state statute in the fourth amendment area patterned on a federal law.

**8.** Mass.Gen.Laws ch. 272, § 99B3 provides: "The term 'intercepting device' means any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication other than a hearing aid or similar device which is being used to correct subnormal hearing to normal and other than any telephone or telegraph instrument, equip-

Most importantly, although a State statute may adopt standards more stringent than the requirements of Federal law, thus excluding from State courts evidence that would be admissible in Federal Courts, a State may not adopt standards that are less restrictive than those set forth in Title III.

*Id.,* 327 N.E.2d at 833.

Appellants rely on the exemptions contained in Mass.Gen.Laws ch. 272, §§ 99B3, B4, and D1a.

As appellants recognize, section 99B3 [8] is modeled on 18 U.S.C. § 2510(5)(a)(i). Their attempt to exclude the use of an extension phone from the sweep of the Massachusetts Act fails as it did under the federal statute. The case relied on by appellants is not on point. In *Commonwealth v. Todisco*, 363 Mass. 445, 294 N.E.2d 860 (1973), there was no discussion at all of the use of an extension telephone for secret eavesdropping. The case involved a valid warrant search of the premises of one suspected of using telephones fraudulently for gaming. When the police officers entered the premises, the receivers had been removed from the phones and they had a telephone repairman replace them. Defendant claimed that the replacement of the receivers was an intercepting device in violation of the Massachusetts statute. It was in this context that the court used the words that appellants have seized upon, "The clear and obvious legislative intent was to prevent the illegal use of devices external and extraneous to the regular telephone equipment." *Id.,* 294 N.E.2d at 865. The facts of the case render the comment inapposite to a deliberate secret intercept by the use of an extension phone.

Section B4 of the Massachusetts statute defines "interception" in terms of secretly hearing and secretly recording. "Intercept" under the federal statute is

ment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business."

defined in terms of an "aural acquisition." 18 U.S.C. § 2510(4).[9] Appellants' argument on this point is a repeat of the implied consent argument that we have already rejected. The claim that the intercept was not secret because Campiti should have known that he would be monitored fails for the same reason. There is no implied knowledge exemption under the Massachusetts statute, just as there is no implied consent exemption under the federal statute. The only Massachusetts case bearing on this point is *Commonwealth v. Jackson*, 370 Mass. 502, 349 N.E.2d 337 (1976). There, the court held that secret tape recordings made of telephone calls from a kidnapper should be suppressed, but allowed in evidence two calls during which the kidnapper stated that he knew his message was being taped. This hardly leads to the conclusion that, under the Massachusetts statute, implied knowledge obviates its secrecy requirement. The district court's finding that Campiti did not know the call would be monitored meets the Massachusetts statutory definition of a forbidden "interception."

Section D1a[10] of the Massachusetts statute, which tracks 18 U.S.C. § 2511(2)(a)(i), insulates an officer, employee, or agent of a communication common carrier from the proscriptions of the statute when engaged in activities necessary for the protection of the rights or property of the carrier. We reject this claim of exemption on the same grounds as we rejected the claim under the federal statute; Walonis was not acting as an officer, employee, or agent of the telephone company.

Finally, appellants assert that they are immune from liability because the intercept was made in good faith. The Massachusetts statute is much tighter in this regard than the federal statute. It provides: "Good faith reliance on a *warrant* issued under this section shall constitute a complete defense to an action brought under this paragraph" (emphasis added). Mass. Gen.Laws ch. 272, § 99Q3. Appellants attempt to transmute the words of the statute by incorporating into them the holding of *Gildea v. Ellershaw*, 363 Mass. 800, 298 N.E.2d 847 (1973),

> that if a public officer, other than a judicial officer, is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.

*Id.* 298 N.E.2d at 858–59. The case was brought by a former city manager against members of the Brockton City Council for attempting to remove him from office. The wiretap statute was not alluded to at all in the opinion and had no bearing on the case. No legislative history or Massachusetts case is offered as a basis for such a transmutation. We decline to rewrite the Massachusetts statute.

*Affirmed.*

---

**9.** Mass.Gen.Laws ch. 272, § 99B4 provides: "The term 'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication[.]"

18 U.S.C. § 2510(4) provides: " 'intercept' means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device."

**10.** Mass.Gen.Laws ch. 272, § 99D1a provides: "It shall not be a violation of this section—a. for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of service or to the protection of the rights or property of the carrier of such communication, or which is necessary to prevent the use of such facilities in violation of section fourteen A of chapter two hundred and sixty-nine of the general laws; provided, that said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.