[No. C016411. Third Dist. Jan. 27, 1994.]

MICHAEL D. BUNNELL, Petitioner, v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Rothschild & Wishek, M. Bradley Wishek and Quin Denvir for Petitioner.

No appearance for Respondent.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Cynthia G. Besemer and Harry Joseph Colombo, Deputy Attorneys General, for Real Party in Interest.

OPINION

SIMS, J.—In this criminal prosecution for misappropriation of public moneys by a public officer (Pen. Code,[1] § 424), removal of public documents (Gov. Code, § 6200), and conspiracy to violate the personal liberty of another (§§ 182, 236), petitioner Michael D. Bunnell filed a petition for writ of prohibition or mandate in this court, challenging the trial court's denial of his motion to suppress evidence assertedly obtained in violation of state and federal wiretapping laws and the Fourth Amendment. Petitioner contends inter alia the trial court erred in concluding the wiretap was permissible as conduct within the ordinary course of a law enforcement officer's duties. We issued an alternative writ of mandate and stayed proceedings in the trial

---

[1]Undesignated statutory references are to the Penal Code.

court. We shall conclude the federal wiretapping statutes bar admission of evidence obtained from the wiretap. We shall therefore issue a peremptory writ directing the trial court to vacate its order denying the suppression motion and to enter a new order granting the suppression motion as to the contents of the intercepted communications and any evidence derived therefrom.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

During 1991 and 1992, petitioner was chief deputy warden at Deuel Vocational Institution (DVI) in Tracy. By information filed in March 1993, petitioner was charged with one count of misappropriation of public moneys by a public officer (§ 424) for allegedly appropriating public moneys to the use of a prison inmate for cosmetic dental services; one count of removal of public documents (Gov. Code, § 6200), for allegedly removing documents from an inmate's file before a parole board hearing; and one count of conspiracy to violate the personal liberty of others (§§ 182 [conspiracy], 236 [false imprisonment]), arising from administrative segregation of three inmates following a fight between other inmates.

Petitioner filed a section 1538.5 motion in the trial court to suppress evidence obtained through a wiretap of a DVI prison telephone, on the grounds that the unauthorized interception of the telephone communications violated the California wiretapping statutes (§ 631 et seq.), the federal wiretapping statutes (18 U.S.C. § 2510 et seq.), and the United States and California constitutional guarantees against unreasonable search and seizure.[3]

The evidence adduced at the hearing on the suppression motion was as follows:

In the spring of 1991, correctional officer Wayne Green was working on DVI's security squad, a subunit of the investigative services unit (ISU) responsible for investigating criminal activity within DVI. Green received information that two inmates—Ralph Miranda and Gilbert Tewksbury—were involved in the use and distribution of heroin within the prison. The security squad wanted to search the two inmates and their cells but were

---

[2]In a separate petition for writ of prohibition (C016256), petitioner challenges on unrelated grounds the trial court's denial of his motion to set aside the information.

[3]The motion sought exclusion of the intercepted communications and "[a]ll evidence which was obtained by the exploitation of the [ ] illegally obtained evidence, including all witness testimony, law enforcement observations made during the ensuing investigation, and all documents, records, and other tangible things." The motion appended an itemized list of the evidence to which petitioner objected.

instructed not to do so by ISU Captain Donald Busser, who had been admonished by petitioner to leave the two inmates alone. The security squad was told Miranda was "the warden's snitch." Green believed the inmates were being protected.

Around April 1991, Green decided to place a wiretap on the captain's clerk's phone, which was used primarily by Miranda in his work assignment as captain's clerk. Green acted on his own and without speaking to any superior officer.[4] Green felt it was "within [his] realm" to initiate the wiretap on his own and "due to the circumstances of what was going on within the institution, how we as squad members and other staff members throughout the institution felt about the protection of the inmates that in order to gather intelligence on these inmates it would have to be done without their knowledge."

Green accomplished the wiretap by running a telephone line from the specific telephone terminal down into a hidden location in the basement and connecting a voice-activated tape recorder that recorded any call made from or received at the captain's clerk's phone. Green learned how to identify the telephone line he wanted by talking to a telephone equipment man who happened to be on the premises.

Although Green initially testified the wiretapped telephone was exclusively for use within the institution, on cross-examination he admitted the phone was capable of accessing the DVI switchboard operator, and thus could be used to place calls outside DVI if the operator could be persuaded to do so. Green also testified he assumed the captain's clerk's phone was capable of receiving calls from outside DVI. The tapes were played for the court and demonstrated that the tapped telephone was indeed used for outside calls.[5]

Green had never previously participated in a wiretap or monitoring of the phone system of which the captain's clerk's phone was a part. Green had no

[4]Petitioner asserts Green acted in spite of Captain Busser's refusal to authorize the wiretap. There was conflicting evidence as to whether this wiretap was discussed beforehand with Captain Busser. Green testified he spoke to no superior officer. It was a colleague of Green's who testified Busser was consulted. Busser testified he knew nothing about this wiretap until after it was removed, though he recalled an unrelated incident where he rejected the idea of placing a listening device in the DVI culinary area.

Petitioner also asserts Green had to obtain special equipment for this surveillance but fails to provide a supporting citation to the record.

[5]The court reporter did not transcribe the contents of the tapes played for the court. Petitioner asserts, and the People do not dispute, that the tapes included a call from Valley Sanitation, a call from a DVI employee calling from a hospital, and a call during which a baby's voice could be overheard and the caller asked Miranda if he wanted to speak with the baby. Moreover, the prosecutor stipulated in the trial court that the intercepted calls were

personal knowledge of any other wiretap or monitoring of this phone system during his tenure at DVI. Captain Busser testified he was unaware of any other wiretap of the phone system of which the captain's clerk's phone was a part. The only prior telephone monitoring performed by Green was of inmate telephone calls from DVI pay phones located in the inmates' dorm units. The monitored pay phones were posted with a conspicuous notice advising users the phones were subject to monitoring. The pay phones were monitored from a tower or control room by a switch that turned on a speaker.

Green's stated purpose in placing the wiretap was to catch Miranda and other inmates in drug trafficking. Fifteen or twenty "busts" were made as a result of the wiretap (which remained in place from April 1991 until March 1992). A couple of weeks after initiating the wiretap, Green was surprised when the tapes disclosed conversations between petitioner, then-Warden Al Gomez, and inmate Miranda.[6] Green became concerned with the integrity of the administration and suspected criminal conduct involving the administration and inmates. He expanded his investigation from narcotics trafficking to an internal affairs investigation of petitioner. Green did not report his suspicions to any superior officer or the internal investigations unit because "we weren't sure as to how far this went." Instead, he anonymously contacted Department of Justice Special Agent Supervisor Albert Fox and informed him of the situation. According to Green, Fox said the wiretap was legal. Green later met with Fox and turned the tapes over to him.

Fox testified the situation was described to him as a tap on an intrainstitutional phone used only for communication within the prison. He told Green the wiretap was legal as long as the wiretapped phone was for intrainstitutional use only and had no outside connection capabilities.

The trial court denied the motion to suppress. As to the state wiretapping law, the trial court rejected the People's argument that the wiretap fell within the state statutory exclusion for phones used exclusively within a correctional facility (§ 631, subd. (b)), but concluded the evidence was nonetheless admissible under state law by virtue of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)).[7] As to the federal wiretapping law, the trial court concluded the wiretap was permissible as occurring within the ordinary course of a law enforcement officer's duties (18 U.S.C. § 2510(5)(a)). The trial court did not specifically address petitioner's Fourth Amendment claim.

"wire communications" within the meaning of title III of the Omnibus Crime Control and Safe Street Act of 1968 (18 U.S.C. §§ 2510-2521). As will appear, by definition "wire communications" means the phone was capable of outside connections.

[6]The parties do not set forth the contents of the intercepted communications.

[7]California Constitution, article I, section 28, subdivision (d), provides in part: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . ."

Petitioner petitioned this court for a writ of mandate or prohibition, as authorized by section 1538.5, subdivision (i). We issued an alternative writ of mandate and stayed further proceedings in the trial court.

## DISCUSSION

### Federal Law

Petitioner contends suppression of the evidence is compelled by the federal wiretapping statutes contained in title III of the Omnibus Crime Control and Safe Street Act of 1968 (18 U.S.C. §§ 2510-2521) (hereafter Title III or the Act). We agree.

■ Where exclusion of wiretap evidence is required under the federal statutes, the evidence cannot be admitted under California law, because "State law [ ] cannot be less protective than the federal Act." (*People* v. *Otto* (1992) 2 Cal.4th 1088, 1092, fn. 1, 1098 [9 Cal.Rptr.2d 596, 831 P.2d 1178] [court found it unnecessary to decide whether wiretap evidence was admissible under California law, because exclusion was required by the federal statutes].)

### A. Title III—Background

The California Supreme Court has described the federal wiretapping law as follows:

"Title III provides a 'comprehensive scheme for the regulation of wiretapping and electronic surveillance.' [Citation & fn. omitted.] The Act makes it unlawful for any person[8] to intercept or endeavor to intercept any wire, oral, or electronic communication '[e]xcept as otherwise specifically' permitted by other provisions of the statute. (18 U.S.C. § 2511(1)(a).) Willful disclosure of the contents of communications by a person who knows or has reason to know that the information was obtained through an unlawful interception is also forbidden. (18 U.S.C. § 2511(1)(c).)

"· . . . . . . . . . . . . . . . . . . . . . . .

"In addition to imposing a criminal penalty for unauthorized interceptions or disclosure of information obtained through such interceptions (18 U.S.C. § 2511(1)(a)), the Act creates a damage remedy for any person whose wire or oral communications have been unlawfully intercepted, disclosed or used. (18 U.S.C. § 2520.) More importantly for our purposes here, the Act also

---

[8]"Person" includes government employees and agents. (18 U.S.C. § 2510(6).)

provides a *suppression* sanction. Title 18, United States Code, section 2515 [] states: 'Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.'

"Thus, a violation of the federal statute renders the illegally obtained evidence inadmissible in state court proceedings. [Citation.] The Act, in effect, establishes minimum standards for the admissibility of evidence procured through electronic surveillance; state law cannot be less protective of privacy than the federal Act. [Citations.]

"The Act also provides the means for invoking the suppression sanction. 'Any aggrieved person in any trial, hearing, or proceeding in or before any court . . . of the United States, a State or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that— [¶] (i) the communication was unlawfully intercepted . . . .' (18 U.S.C. § 2518(10)(a).) The Act defines an 'aggrieved person' as one 'who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed.' (18 U.S.C. § 2510(11).)" (*People* v. *Otto, supra*, 2 Cal.4th at pp. 1097-1098, original italics [homicide victim's surreptitious tape recordings of wife's telephone conversations plotting murder were inadmissible in criminal prosecution because they violated Title III].)

"Except as expressly authorized in Title III, . . . all interceptions of wire and oral communications are flatly prohibited." (*Gelbard* v. *United States* (1972) 408 U.S. 41, 46 [33 L.Ed.2d 179, 186, 92 S.Ct. 2357].) "The statute contains no specific exception for wiretapping at a prison." (*United States* v. *Paul* (6th Cir. 1980) 614 F.2d 115, 116, fn. 2 [61 A.L.R.Fed. 816].) Similarly, the California Supreme Court has held Title III was violated by a deputy sheriff's surreptitious tape recording of an arrestee's phone call to his wife from jail. (*Halpin* v. *Superior Court* (1972) 6 Cal.3d 885, 896-900 [101 Cal.Rptr. 375, 495 P.2d 1295].) *Halpin* rejected the government's argument that application of Title III would infringe upon the state's constitutional right to regulate and administer the internal affairs of its penal institutions. (6 Cal.3d at pp. 896-900.)

Title III does, however, contain an exemption for some interceptions by investigative or law enforcement officers in the "ordinary course of [their]

duties." (18 U.S.C. § 2510(5)(a)(ii).) Though commonly referred to as an exception, it is actually a restrictive definition. (See *Deal* v. *Spears* (8th Cir. 1992) 980 F.2d 1153, 1157.) Thus, Title III prohibits "interception" of communications. "Interception" is defined as the acquisition of the contents of communications through the use of any "electronic, mechanical, or other device." (18 U.S.C. § 2510(4).) The definition of "electronic, mechanical, or other device" expressly excludes telephone or telegraph equipment "being used . . . by an investigative or law enforcement officer in the ordinary course of his duties; . . ." (18 U.S.C. § 2510(5)(a)(ii)).[9]

We turn now to the application of Title III to this case.

### B. *Captain's Clerk's Phone Wiretap Violated Title III*

 Petitioner contends the trial court erred in determining the wiretap of the captain's clerk's phone fell within the statutory exemption for conduct within the ordinary course of law enforcement duties. We agree.

In the trial court, petitioner sought exclusion of the evidence under the federal statutes. The prosecutor stipulated that the communications at issue were "wire communications" within the meaning of 18 United States Code section 2510.[10]

The trial court found the wiretap fell within the federal statutory exception for conduct in the ordinary course of law enforcement duties.[11] The trial court stated: "With regard to the wiretap admissibility here I'll find that the

---

[9]18 United States Code section 2510(5) provides: " '[E]lectronic, mechanical, or other device' means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than—[¶] (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, . . . (ii) being used . . . by an investigative or law enforcement officer in the ordinary course of his duties; . . ."

[10]18 United States Code section 2510(1) defines "wire communication" as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications for communications affecting interstate or foreign commerce. . . ."

Had the captain's clerk's phone been incapable of outside connections, it would not have constituted a "wire communication" protected by Title III because it could have no affect on interstate commerce. (*People* v. *Von Villas* (1992) 11 Cal.App.4th 175, 224 [15 Cal.Rptr.2d 112] [conversation on jail intercommunication phone for inmates to speak with visitors was not wire communication].)

[11]The parties do not dispute that Green was an investigative or law enforcement officer within the meaning of the federal exemption. Prison employees may qualify as "investigative or law enforcement officers" under Title III. (*United States* v. *Clark* (M.D.Pa. 1986) 651 F.Supp. 76, 78-79.)

Federal exception where the wiretap was conducted in the ordinary course of law enforcement duties does apply here in this case. The focus was narcotics investigation, the trafficking of the inmates initially. And I think that that was a proper and appropriate focus and one that was in the ordinary course of their duties. And so the exception applies. Once it started to expand beyond that then permission or approval or actually technically the authority was continued through the office of the [ ] Department of Justice of the State of California with the attorney general giving authority there."

Petitioner argues the trial court erroneously focused on the question whether the *purpose* of the investigation was within the ordinary course of the officer's duties, rather than whether the *wiretap use* was within the ordinary course of the officer's duties. While we disagree with petitioner's assertion that the purpose of the investigation is immaterial, we agree that the law enforcement purpose of the investigation is not in itself sufficient to satisfy the exemption. At a minimum, the use of the wiretap must also be in the ordinary course of the officer's duties, as the statute plainly says. (See fn. 9, *ante*.)

Thus, in *Campiti v. Walonis* (1st Cir. 1979) 611 F.2d 387, a prison administrator was reportedly giving favored treatment to a prison inmate, which prompted an investigation by the security management team of the state's department of corrections. The inmate was transferred to a different correctional facility, where he requested permission to telephone the administrator of the first prison. An officer took the inmate to an administrator's office, placed the call, then left the inmate alone in the room. Unbeknownst to the participants to the conversation, the call was monitored by the security management team investigator, who listened in on an extension phone wired directly into the main switchboard. (*Id.* at pp. 389-390.) *Campiti* rejected the government's argument that the interception was lawful under the law enforcement exception or the "ordinary course of business" exception.[12] (*Id.* at p. 391.) "[Defendants] have devoted a good portion of their brief to urging that this was routine monitoring and that [the investigator's] eavesdropping was pursuant to his official duties. The claim of routine monitoring flies in the face of the facts. The usual method of monitoring was for a guard to stand near enough to the caller to hear that end of the conversation. [The investigator], moreover, had never engaged in telephone monitoring before as a member of [the security management team]. The decision to have [the investigator] listen in on Campiti's call to Sheriff Martin was thus an

---

[12]In addition to the law enforcement exemption, Title III excludes from the definition of "electronic device" telephone equipment "used by the subscriber [ ] in the ordinary course of its business. . . ." (18 U.S.C. § 2510(5)(a)(i).) Here, the People do not contend Green's wiretap of the captain's clerk's phone was in the ordinary course of business.

exceptional course of conduct for both [the investigator] and the [prison] administration." (*Id.* at p. 392.) In a footnote, *Campiti* remarked: "We therefore need not decide whether, had this call been intercepted pursuant to an established prison policy of which the prisoners had been informed, the monitoring could permissibly qualify as part of the ordinary course of correctional officers' business within the purview of 18 U.S.C. § 2510(5)(a)." (*Id.* at p. 392, fn. 4.)

Subsequent federal cases have held that routine prison monitoring of inmates' telephone calls as a prison security measure meets the law enforcement exemption. Thus, in *United States* v. *Paul*, *supra*, 614 F.2d 115, corrections officers monitored telephone conversations between an inmate and a person outside the prison who arranged to bring contraband into the prison. The appellate court, after recognizing the government's need to monitor prisoners' telephone calls as a security measure, stated: "The monitored calls in this case came in over the prison switchboard and were then routed to telephones provided for inmate use within the institution. The district court found that the telephone monitoring took place pursuant to a policy statement issued by the Federal Bureau of Prisons as well as local prison rules. Although the issue was disputed, the court found that the telephone rules were posted and that the inmates had reasonable notice that monitoring of telephone conversations might occur. [¶] Under these circumstances, we conclude, as did the district court, that the monitoring took place within the ordinary course of the Correctional Officers' duties and was thus permissible under 18 U.S.C. § 2510(5)(a)." (*Id.* at p. 117; see also *U.S.* v. *Daniels* (7th Cir. 1990) 902 F.2d 1238, 1245 [monitoring complied with federal regulations and inmate was aware calls might be monitored]; *U.S.* v. *Sababu* (7th Cir. 1989) 891 F.2d 1308, 1329 [monitoring activity was conducted pursuant to institutionalized, ongoing prison policy of which prisoners were informed]; *U.S.* v. *Cheely* (D.Alaska 1992) 814 F.Supp. 1430, 1439-1444 [routine monitoring authorized by supervisors undertaken for purpose of safeguarding institution rather than to obtain evidence of specific crime]; *United States* v. *Clark* (M.D.Pa. 1986) 651 F.Supp. 76, 80 [monitoring was in accordance with prison policy and procedures, and users of the phones were informed that calls might be monitored].)

Despite the foregoing cases, the Attorney General takes the position that the law enforcement exemption applies whenever a law enforcement purpose exists. We disagree with the Attorney General for two reasons.

First, the cases construing the law enforcement exemption have required that there be routine monitoring, usually subject to established prison policies and procedures. We are aware of no case authority endorsing the

People's position that a law enforcement purpose in and of itself suffices to meet the exemption.

Second, the People's position would emasculate other provisions of Title III, which set forth extensive provisions for law enforcement officers to obtain judicial authorization to conduct a wiretap in connection with the investigation of enumerated crimes. "[W]hen reasonably possible, a statute should be so interpreted as to harmonize all its requirements by giving effect to the whole." (*Earle* v. *Carson* (1902) 188 U.S. 42, 47 [47 L.Ed. 373, 376, 23 S.Ct. 254].) " 'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' [Citations.]" (*Mastro Plastics Corp.* v. *N.L.R.B.* (1955) 350 U.S. 270, 285 [100 L.Ed. 309, 321, 71 S.Ct. 349].)

 Thus, the purpose of title III is "effectively to prohibit, on the pain of criminal and civil penalties [fn. omitted], all interceptions of oral and wire communications, except those specifically provided for in the Act, most notably those interceptions permitted to law enforcement officers when authorized by court order in connection with the investigation of the serious crimes listed in § 2516." (*United States* v. *Giordano* (1974) 416 U.S. 505, 514 [40 L.Ed.2d 341, 353, 94 S.Ct. 1820].) Title 18 United States Code section 2516,[13] provides that the Attorney General (or certain designated officers) of the United States or of any state may authorize a law enforcement application for a judicial order authorizing a wiretap. This provision "made preliminary approval of submission of wiretap applications a central safeguard in preventing abuse of this means of investigative surveillance . . . ." (*United States* v. *Chavez* (1974) 416 U.S. 562, 571 [40 L.Ed.2d 380, 390, 94 S.Ct. 1849].) The procedures have been further summarized as follows: "Judicial wiretap orders must be preceded by applications containing prescribed information, ·§ 2518(1). The judge must make certain findings before authorizing interceptions, including the existence of probable cause,

---

[13] 18 United States Code section 2516(2), which references state law enforcement, provides in part: "The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire, oral, or electronic communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses."

§ 2518(3). The orders themselves must particularize the extent and nature of the interceptions that they authorize, § 2518(4), and they expire within a specified time unless expressly extended by a judge based on further application by enforcement officials, § 2518(5). Judicial supervision of the progress of the interception is provided for, § 2518(6), as is official control of the custody of any recordings or tapes produced by the interceptions carried out pursuant to the order, § 2518(8). . . ." (*United States* v. *Giordano, supra*, 416 U.S. at pp. 514-515 [40 L.Ed.2d at p. 353].)

The Act "not only limits the crimes for which intercept authority may be obtained but also imposes important preconditions to obtaining any intercept authority at all. Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications. These procedures were not to be routinely employed as the initial step in criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. §§ 2518(1)(c) and (3)(c). The Act plainly calls for the prior, informed judgment of enforcement officers desiring court approval for intercept authority, and investigative personnel may not themselves ask a judge for authority to wiretap or eavesdrop. The mature judgment of a particular, responsible Department of Justice official is interposed as a critical precondition to any judicial order." (*United States* v. *Giordano, supra*, 416 U.S. at pp. 515-516 [40 L.Ed.2d at p. 353].)

■ To adopt the People's position in the case before us—that any wiretap is permissible if conducted with a law enforcement purpose—would emasculate Title III in the law enforcement arena and would render superfluous the extensive provisions of 18 United States Code sections 2516 and 2518. In order to effectuate the purpose of the Act, the law enforcement exemption must be narrowly construed.

We thus conclude a law enforcement purpose is not in and of itself sufficient to meet the law enforcement exemption; at a minimum, the *wiretap use* must also be within the ordinary course of the officer's duties. In the context of this case, the law enforcement exemption applies only if the wiretap activity was routine prison monitoring of inmate calls as a prison security measure.[14]

Here, petitioner has demonstrated that, although the purpose of Officer's Green's investigation (narcotics trafficking) was within the scope of his

---

[14]In this case we have no occasion to consider the extent to which the law enforcement exemption may apply outside the context of prison security.

duties, Officer Green's wiretap of the captain's clerk's phone was not in the ordinary course of his duties but was an extraordinary event. Indeed, Green himself admitted at the suppression hearing that the wiretap of the captain's clerk's phone was "out of the ordinary" at DVI (though not at other institutions). Moreover, the evidence showed the security squad's normal investigative method was to conduct searches of inmates and their living and work areas. When petitioner squelched the squad's plan to search Miranda's quarters, Green initiated the wiretap on his own and without seeking or obtaining authority from any superior officer. Green's testimony shows he deliberately acted in secret because he believed his superior officers were protecting Miranda. The only prior monitoring in which Green had participated was of the pay phones in the inmates' housing units. At the time Green decided to initiate the wiretap on the captain's clerk's phone, he was unaware of any equipment at DVI capable of monitoring the phone system of which the captain's clerk's phone was a part. He learned how to accomplish the wiretap by speaking with a telephone equipment man who happened to be on the premises and showed him how to distinguish which line went to which phone in order to tap that line. We find these facts sufficient to demonstrate that Green was not acting in the ordinary course of his law enforcement duties.

The Attorney General does not dispute the foregoing facts. Instead, the Attorney General argues the law enforcement exception applies here because (1) the captain's clerk's phone was monitored as a security measure to thwart narcotics distribution in the prison, a purpose within the scope of the officer's responsibilities; (2) the monitoring was of a single phone used by inmates primarily to make and receive calls within the prison and investigators were not interested in calls outside DVI; (3) the monitoring was not limited to any particular call or caller; and (4) the officers were forced to resort to a wiretap because petitioner interfered with their ability to execute their responsibility in the usual manner by searching inmates. None of these circumstances make the wiretapping an activity within the ordinary course of the officer's duties.

The parties do not address what effect, if any, the Department of Justice's involvement has on the applicability of the law enforcement exemption. As indicated, the trial court mentioned the Attorney General's "authorization." In context, it appears the trial court meant only that the internal affairs aspect of the investigation (which was not ordinarily part of Green's duties) was authorized by the Attorney General. We have concluded a law enforcement purpose does not in itself justify the exemption. To the extent that the trial court's comments might be interpreted as a finding that the Department of Justice authorized use of the wiretap, we note the Department of Justice

representative told Green only: "That as long as it was the internal—the intrainstitutional phone such as an intercom system [ ] and had no outside line capabilities that such a tap would be legal in their opinion." Thus, the Attorney General did not authorize the tap on this phone, which was capable of outside connection.

We conclude the "ordinary course of law enforcement duties" exception does not apply in this case. Accordingly, suppression of the evidence is compelled under Title III. We therefore need not address petitioner's alternative arguments that exclusion is required by California law or the constitutional guarantees against unreasonable search and seizure.

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent superior court to vacate its order denying petitioner's suppression motion and enter a new order granting the suppression motion as to the contents of the unlawfully intercepted communications and any other evidence referenced in petitioner's suppression motion which the trial court determines was derived from the unlawful interception.

Sparks, Acting P. J., and Nicholson, J., concurred.